## GEORGE MEISINGER *v.* STATE OF MARYLAND.
### [No. 23, January Term, 1928.]

*Decided April 18th, 1928.*

The cause was argued before Bond, C. J., Pattison, Urner, Offutt, Digges, Parke, and Sloan, JJ.

*Harold E. Cobourn,* for the appellant.

*J. Hubner Rice, Assistant Attorney General,* with whom were *Thomas H. Robinson, Attorney General,* and *Henry L. Constable, State's Attorney for Cecil County,* on the brief, for the State.

Pattison, J., delivered the opinion of the Court.

On September 19th, 1927, the appellant, George Meisinger, was indicted in the Circuit Court for Cecil County for having in his possession, in said county, intoxicating, spirituous, or fermented liquors, with intent then and there to unlaw-

fully sell the same within the limits of said county, in violation of sections 179 and 180 of chapter 532 of the Acts of 1898. The appellant moved to quash the indictment and, upon his motion being overruled, he pleaded "not guilty." The case was tried by the court, sitting as a jury, and the defendant was found guilty and sentenced to confinement in the Maryland House of Correction for six months. From that judgment this appeal was taken.

In the course of the trial two exceptions were taken to the admission of evidence procured under a search warrant issued by a justice of the peace, at the instance of the state's attorney for Cecil County, directed to the sheriff of that county, to search the premises of the appellant in said county for intoxicating liquors and to seize the same if found.

The question presented for our decision, both by the motion to quash and the exceptions to the evidence, arises from the opposite contention of the parties as to the admissibility of evidence secured under and by virtue of what is conceded to be an illegal search warrant.

This question has been the subject of a great number of decisions by the Supreme Court, the federal courts, and the appellate courts of many, if not all, of the states. These decisions show a great diversity of opinion, and it is impossible to harmonize the opinions or the reasoning employed therein as expressed by the various courts, or even in some instances to show consistency between the decisions of the same court. We find that not infrequently courts, both federal and state, have expressed one view in one opinion, later reversing that decision, and later still returning to the opinion first expressed. In a copious note to the case of *State v. Wills*, 91 W. Va. 659, 24 A. L. R. 1398, decided in 1922, the annotator has collected the cases supporting each side of this contention, and at page 1409 states: "It is, or at least was, a general rule of evidence that its competency is not affected by the fact that it was wrongfully obtained; or, to state it more fully, that the court in which papers or other articles are offered in evidence can take no notice whether they were lawfully or unlawfully obtained, nor will it frame a collateral issue to

determine that question. What is the effect upon this rule of evidence of the rights secured by the Fourth Amendment to the United States Constitution and by the similar provisions in state constitutions? Up to within a few years there were but few cases in which the constitutional right had been held to interfere with the rule, but in 1914 the decision by the Supreme Court of the United States in *Weeks v. United States,* 232 U. S. 383 (*infra*) held the constitutional rights supreme when asserted before trial, and the later cases in that court in effect hold that the constitutional right is to be recognized though first asserted at the trial." Since these decisions of the Supreme Court, a number of cases in state courts have taken a similar view. The correctness of the position taken in these later cases is denied, and the earlier rule defended, by Professor Wigmore in an article appearing in the American Bar Association Journal, August, 1922, page 479, which article was replied to in the following October number of the same journal by Mr. Connor Hall, each author vigorously contending for the correctness of his view. The authorities are divided into those supporting what may be termed the old doctrine, that is, the rule that such evidence is admissible, and those adhering to the new rule, deciding against its admissibility. Among the former this court is to be found, it having definitely determined that the rule which allows evidence of this character to be admitted is in force for the guidance of the courts and the admission of testimony therein in this state. This conclusion was reached by our predecessors in the case of *Lawrence v. State,* 103 Md. 17, and must be taken now as conclusive on the question, so far as this state is concerned. It was said in that case: "In the recent and valuable work on Evidence of Professor Wigmore it is affirmed, upon an exhaustive and discriminating review of the authorities, that it is universally conceded that chattels and documents in the possession of an accused party are within the protection of the constitutional provisions in question, if sought to be produced in evidence through process against him as a witness: but if obtained from him otherwise

than by the use of such process they are not within the privilege which these provisions confer. 4 *Wigmore on Evidence,* sec. 2264." The court then adopts the rule as laid down in 1 *Greenleaf on Evidence,* sec. 254, that "though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice of how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." This statement of the rule has been adopted in the opinion of many of the courts, and may with certainty be denominated the rule more largely adhered to throughout the Union.

In *People v. Defore,* 242 N. Y. 13, decided in 1926, sustaining the old rule, Judge Cardozo, speaking for the court, said: "The new doctrine has already met the scrutiny of courts of sister states. The decisions have been brought together for our guidance through the industry of counsel. In forty-five states (exclusive of our own) the subject has been considered. Fourteen states have adopted the rule of the *Weeks* case either as there laid down, or as subsequently broadened. Thirty-one have rejected it. Typical among these are Massachusetts (*Comm. v. Wilkins,* 243 Mass. 356; *Comm. v. Donelly,* 246 Mass. 507); California (*People v. Mayen,* 188 Cal. 237); Connecticut (*State v. Reynolds,* 101 Conn. 224); Ohio (*Rosanski v. State,* 106 Ohio St. 442); Kansas (*State v. Johnson,* 116 Kan. 58; 116 *Id.* 179); Iowa (*State v. Rowley,* 197 Iowa 977, 979); and Virginia (*Hall v. Comm.,* 138 Va. 727). To what is there written little of value can be added. The controversy, starting with the courts, has been taken up by the commentators, and with them has been the theme of animated argument. For the most part, there has been adherence to the older doctrine (4 *Wigmore on Evidence* [2nd ed.], pars. 2183, 2184; *Harno, Evidence Obtained by Illegal Search and Seizure,* 19 Ill. Law. Rev. 303; *Knox, Self-incrimination,* 74 Penn. Law Rev. 139;

*Fraenkel, Concerning Searches and Seizures,* 35 Harv. L. R. 361, 386. *Contra, Chafee, The Progress of the Law,* 35 Harv. L. R. 673, 694; *Atkinson, Unreasonable Searches and Seizures,* 25 Col. Law Rev. 11). With authority thus divided, it is only some overmastering consideration of principle or of policy that should move us to a change. The balance is not swayed until something more persuasive than uncertainty is added to the scales."

The reason upon which the rule rests is that, in the trial of criminal cases, the admissibility of evidence is to be determined by its pertinency to the issue under consideration, and in cases like the one before us the court is not concerned with the collateral question of how such evidence may have been procured. The question of the guilt or innocence of the accused cannot be affected by its method of procurement, if the evidence offered is in itself germane and pertinent to the issue to be decided.

If this case were the first in this court involving the question now under consideration, we would be at liberty to examine and comment upon the authorities and the reasons supporting them in other jurisdictions, but, it having been definitely decided by our predecessors that when evidence offered in a criminal trial is otherwise admissible, it will not be rejected because of the manner of its obtention, we feel bound by that decision, and are entirely content to follow the reasoning therein employed, especially in that it is supported and fortified by the weight of authority elsewhere.

The seizure of the liquor admitted in evidence was unlawful, there being no statute, applicable to Cecil County, authorizing the issuance of a search warrant in cases of this character. The warrant should not have been issued, and the sheriff in serving the warrant was a trespasser. *Comm. v. Tibbetts,* 157 Mass. 519; *People v. Defore, supra.* Nevertheless, the liquor so seized was admissible in evidence, under the decisions of this court. Therefore, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs to appellee.*

PARKE, J., filed the following dissenting opinion.

The premises of the traverser were invaded by the sheriff, who there searched and seized intoxicating liquor, and utensils and material used in its making, which he took into his possession and removed. Upon the evidence so secured, the traverser was arrested, indicted, convicted, and sentenced. There was no statutory or other valid ground for the search warrant under which the sheriff acted; and the sheriff was a trespasser and all he did was unlawful. Notwithstanding this evidence was admittedly obtained in violation of the constitutional rights of the traverser, the decision of this court holds this evidence admissible, on the ground that consideration of the question is foreclosed by the case of *Lawrence v. State,* 103 Md. 17.

The doctrine of *stare decisis* makes for the interests of the state and of the individual, and the proper administration of justice by assuring stability and uniformity in the declaration and enforcement of law. But the application of the doctrine is not according to rigid rules, and must be determined in each case from its particular facts and circumstances. Thus, it is most strictly applied when decisions have settled rules of property upon which rights are based, and under which titles have vested, especially when the decisions relate to realty and where they have become the basis of contractual relations. If the decisions do not concern such matters but deal with a question which affects the right or extent of personal liberty, the enforcement of the principle is less strict and is governed by that general consideration which favors certainty and uniformity in the law.

The rule of *stare decisis* rests upon the primary assumption that the prior judicial determination of a legal principle is sound, and, therefore, must be followed; but, if no question affecting land, contract, vested interest, or right be involved, and if it appear that the court was in error, the fundamental basis and utility of the doctrine in the particular instance is gone; and so, in matters affecting vital or weighty public or private rights as defined above and the decision is to put them upon a fixed basis for the future, it is the duty and the

right of the court to review its former decisions and to suffer no former error to control its judgment. If the doctrine were not thus limited, it would serve to perpetuate error by never permitting a mistake to be corrected. It is therefore, strictly within the province of this appellate tribunal to examine its decision in *Lawrence v. State,* 103 Md. 17, to see whether it was decided that, if the citizen's domicile be unlawfully invaded for the purpose of learning if a misdemeanor has been committed upon his premises, the evidence so procured may be used against him in a subsequent criminal prosecution.

The differences between the facts in the case of *Lawrence v. State, supra,* and the one at bar are significant. In the first case, the accused was under arrest on the charge of a conspiracy to defraud and in the custody of the police, who sent to the hotel where the prisoner had been and got the satchel which the accused had left there. In the presence of the prisoner, the police either took from this satchel, according to their version, or from the person of the accused, as he testified, certain securities, which were later offered and admitted in evidence to show guilty knowledge. The accused was stopping temporarily at the hotel, and the satchel while there was in the possession of the hotel keeper as bailee, and the bailee could have been compelled to have produced the satchel under a *subpoena duces tecum,* to be disposed of as the court directs. 1 *Bishop's New Crim. Proc.,* sec. 211; *Wharton's Crim. Pl. & Pr.* (8th Ed.), sec. 60. *Lawrence v. State, supra,* quotes with approval this language of *State v. Height,* 117 Iowa, 650: "There are, of course, limitations as to the immunity from search and seizure for the purpose of securing evidence of crime. It is well settled that when one charged with an offense is arrested, the officers may, without further legal procedure, seize weapons with which the crime has been committed, property which has been obtained by means of the criminal act, or articles which may give a clue to the commission of the crime or identify certain of the criminals." (Page 37.) Such a search of the person and seizure of property in the possession of the accused at the time of his arrest or in that of his bailee is an incident

to a lawful arrest; and, therefore, does not constitute an unreasonable search and seizure within the protection of the Constitution of the United States and the Bill of Rights of Maryland, nor would the evidence so obtained be barred as compelling the traverser to testify. It follows that *Lawrence v. State, supra,* is, *on its facts,* not an authority supporting the prevailing opinion in the instant case, because here the traverser was not charged with a crime, nor was he under arrest when his premises were searched. The owner was not committing a crime nor exposing contraband goods in the presence of an officer of the law, but, because the state's attorney thought he had probable cause to believe that the local liquor law was being violated, he procured an illegal search warrant whereby the sheriff unlawfully entered upon the traverser's premises for the sole purpose of discovering if a crime were being committed and of securing the evidence to convict the traverser, if his search and seizure proved successful. It, therefore, needs no argument to enforce the point that, because of wide and fundamental difference in facts, the decision in *Lawrence v. State, supra,* is not controlling, unless because it contains the declaration of some applicable principle of law.

In determining the admissibility of the incriminatory papers there offered in evidence, this court held that the objection could only go to the means of their procurement, and that the manner in which the State secured control of these articles did not make them inadmissible in evidence. In the course of its discussion of the immunity afforded an accused party by the Fourth and Fifth Amendments to the Constitution of the United States and article 22 of the Bill of Rights, this court referred to cases and authorities to illustrate its theory, and cited with approval the general conclusion of both Greenleaf and Wigmore that chattels and documents in the possession of an accused party are within the constitutional provisions mentioned, if sought to be produced in evidence through process against him as a witness, but if obtained from him otherwise they were not within the protection afforded by these constitutional mandates.

The quotation from Greenleaf was that, "though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice of how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question."

The cases and authorities cited and quoted, and the language used by the court in argument and in declaring the principle or rule of law adjudged, must be construed in the light of the circumstances of *Lawrence v. State, supra,* since the statement of the law may have a restricted or enlarged construction by reason of its connection with the specific facts, which give character and definition to the finding of law. The reasoning of the court is directed to the particular circumstances of the case, and indicates no purpose to announce principles of law applicable to a different state of facts. If this were not true, the decision could be taken to hold that the admissibility of evidence is not affected by the illegality of the means through which the party has been able to obtain the evidence, which is the construction given by the opinion of the majority of the court in the appeal at bar. 4 *Wigmore on Evidence* (2nd Ed.), secs. 2183, 2184. Should this principle be sound with reference to documents, chattels, and testimony obtained by illegal search and seizure in violation of the Fourth Amendment of the Constitution of the United States and article 26 of the Bill of Rights, why should it not be sound with respect to self-criminatory evidence in the form of confessions obtained by unlawful or improper means from parties accused of crime in violation of the Fifth Amendment of the Constitution of the United States, and article 22 of the Bill of Rights of Maryland? In both instances, the parties are within the protection of the Constitution and the Bill of Rights. Although there are authorities to the contrary, this court has recognized the connection between the privilege against unreasonable searches and that against self-incrimination. In *Blum v. State,* 94

Md. 375, it was said, at page 382: "Moreover, the Fourth and Fifth Amendments to the Constitution of the United States which are *in pari materia* with articles 26 and 22 of our Declaration of Rights, have been held in *Boyd v. U. S.,* 116 U. S. 616, to be intimately related to each other and to throw great light on each other." These constitutional guarantees are the outgrowth of analogous common law principles, as is illustrated by this quotation from the opinion of Lord Camden in *Enteck v. Carrington,* 19 How. St. Tr. 1029 (1765): "It is very certain, that the law obligeth no man to accuse himself, because the necessary means of compelling self accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle." This view would seem the natural consequence of the intimate relation of a search warrant with the detection and prosecution of crime. See *Fraenkel, "Concerning Searches and Seizures,"* 34 Harv. Law Rev. 361, 367, notes 35, 36; *Chafee, Progress of the Law,* 35 Harv. Law Rev. 694-704; *Chafee, Freedom of Speech* (1920), p. 303, and note, and page 307; *Niles, Constitutional Law,* 50; *Bram v. United States,* 168 U. S. 532; *Gouled v. United States,* 255 U. S. 298; *Cornelius, Search and Seizure,* secs. 8, 9, 10. Compare 4 *Wigmore on Evidence,* secs. 2183, 2184, 2264, 2266, 818-821, 851.

If the rule that the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence was intended by *Lawrence v. State, supra,* to be unqualifiedly pronounced, then, if a gaoler, by threats, by putting in fear or by torture, induce a prisoner in custody to confess a crime, the incriminatory statement would be admissible in evidence. No one would argue that the self-incriminating statement of the prisoner would be received, notwithstanding its exclusion would deprive the prosecution of the evidence of his guilt and so allow a criminal to escape a just conviction. Necessarily the principle of law stated in *Lawrence v. State, supra,*

is not of universal application, but is restricted in its application to similar circumstances and, consequently, the decision is not a precedent for the law governing the pending case, whose facts have been seen to be of a different kind. In this opinion the author of *Cornelius on Search and Seizure* agrees. See section 7, page 49, note under "Maryland." The majority of this court came to a different conclusion, and declined to adopt the federal rule that, subject to certain restrictions and qualifications, evidence obtained by an illegal search and seizure will not be admitted in a criminal prosecution.

The courts are greatly divided on this important question. Although the numerical preponderance of the state courts remains opposed to the federal rule, yet in recent years there has been a marked movement on the part of the state appellate courts towards the adoption of the federal rule. This is shown by the fact that within seven years the number of state courts favoring the exclusion of the testimony has increased to sixteen, and that of these only six were originally of that view, while Iowa is the only state whose court has changed its position to one favoring admissibility. See Law Notes, January, 1928, page 191. The gravity of the situation is thus expressed by the Supreme Court of the United States in *Gouled v. U. S.*, 255 U. S. 298, "It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in *Boyd v. United States,* 116 U. S. 616, in *Weeks v. United States,* 232 U. S. 383, and in *Silverthorne Lumber Co. v. United States,* 251 U. S. 385) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments. The effect of the decisions cited is: that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the

individual citizen—the right to trial by jury, to the writ of *habeas corpus,* and to due process of law. It has been repeatedly declared that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over zealous executive officers."

The rights secured by the federal Constitution are those, also, guaranteed by the Constitution of Maryland, *supra,* and I can conceive of no higher judicial duty and function than steadfastly to preserve and enforce the constitutional rights of the citizen against the arbitrary abuse of executive or administrative officers. It is not perceived how any constitutional right of the accused was invaded in the case of *Lawrence v. State, supra,* nor how it can be a precedent to stay the court in the instant case. Here the state's attorney, who must know that it is illegal and in violation of the constitutional rights of the citizen, but intending to use officially any evidence thereby obtained, causes a search warrant to issue. It is done on his oath as state's attorney, and the sole purpose of this unlawful proceeding is to set in motion an exploratory search and seizure of the citizen's home to discover if he is committing a misdemeanor, and to secure the evidence of his crime, if he be found violating the law. In short, the state's attorney suggests, the justice of the peace issues, and the sheriff executes, an unlawful writ involving a forcible and illegal entrance of the accused's home, where the owner has the right to defend his castle against this intrusion and to repel force by force. *Cooley on Constitutional Limitations* (8th ed.) 630. The unlawful conduct of the officers is provocative of violence and of grave results. It tends to create public disorder and contempt for law, with a consequent lessening of respect for its authority and of obedience to its command. For who shall feel bound by law when its sworn conservators flout its familiar constitutional mandates.

The occasional detection of crime affords no justification for the illegal search, since the constitutional guaranties pro-

tect the guilty with the innocent, and the wrong may next be done to a guiltless citizen. If immunity be not common to all citizens under similar conditions, it will be assured to none. Again, the guaranty of immunity is said to derive from Magna Carta and to find another expression in the maxim, "Every man's home is his castle"; so maintaining its inviolability transcends the temporary emergency of current events. While now the guaranty is being systematically violated by public officers to detect and punish the violators of the laws against the sale and possession of intoxicating liquors, the next phase may be one in which public officers will disregard the law in an effort either to discover smugglers and confiscate their goods, as in the days of Otis; or to secure the conviction of printers and authors for criminal or seditious libel, as in the case of Wilkes; or to find evidence among the papers of political suspects according to the practice in the time of Charles II. These are not chimerical illustrations, since history has a way of repeating itself, and there is no adequate means of preventing these violations of constitutional guaranties by arbitrary, unscrupulous, or over-zealous officials, so long as courts, ignoring the unlawful methods employed, will hold admissible to prove guilt the papers, chattels, and other evidence thus illegally obtained. If the federal court had not declared that, as a general rule, an illegal search and seizure was unreasonable and the evidence thereby obtained was inadmissible, the guaranties of the Fourth Amendment would have been nullified. In speaking of the federal rule, Prof. Chafee said that this view "makes the evidence inadmissible if obtained through unreasonable seizure, just as the violation of the privilege against self-incrimination results in the exclusion of the incriminatory statement. Although other kinds of illegality do not keep out evidence, in this instance the illegality is condemned by the Constitution. Some effective sanction should be provided to make sure that the Constitution is enforced. The civil action for damages is insufficient today. * * * The Fourth Amendment would be a dead letter if the United States Supreme Court had not since

the decision in *Weeks v. United States* adopted the exclusion theory." 35 Harv. Law Rev. 695, 696-701; *Cooley's Const. Lim.* (18th ed.), 610-636.

Unless the federal rule be adopted in Maryland, the similar provisions of our Bill of Rights will continue to be useless for the protection of the citizen. Even if the case of *Lawrence v. State, supra,* were a clear precedent against the acceptance of the general rule enforced by the federal tribunals and by sixteen state courts, the writer believes that the weight of argument should cause the case to be rejected, in order that the guaranties of the Constitution be made effective for the purpose designed. To the argument that the federal rule will make the detection and punishment of crime more difficult, it may be replied that the rule advocated is limited to unreasonable search and seizure, and so does not apply to the incidental search and seizure in connection with a valid arrest, with or without a warrant, nor to cases where the goods themselves are contraband and exposed to the view of the officers. *Cornelius on Search and Seizure,* sec. 25, p. 86. It will be for the court to decide whether the facts make the search unreasonable in the same manner as the court determines the existence of the elements necessary to make a confession by a prisoner admissible.

The federal rule has the merit of not tending to induce in public officers, who are sworn to keep the law, the commission of a crime in order to investigate if one has been committed. Another practical reason for the rule is that the preservation to the citizen of his right of freedom from unreasonable search and seizure is more conducive to the peace, general welfare, and good order of the state, than for a court of justice to condone a premeditated violation of the law by a public officer and thereby bring the law into disrepute by encouraging public officers to violate it, and by teaching the public that the State can, through its officers, break its own laws with impunity.

The rule here advocated does not grow out of any tenderness for the criminal, but is made necessary by the gravest

considerations of public policy, which fairly outweigh the disadvantage to the state of any increased difficulty in securing evidence for conviction. Rules of evidence excluding testimony on far less weighty grounds of public policy are enforced to the disadvantage of the prosecution, and without any relaxation because they afford a way of escape for the guilty. These rules, as stated by Wigmore, "forbid the admission of various sorts of evidence because some consideration extrinsic to the investigation of courts is regarded as more important and overpowering." Among these rules of exclusion are state secrets; privileged communications to attorneys; testimony by the husband or wife against the other; self-incriminatory facts; and a confession not voluntarily made. *Greenleaf on Evidence* (16th Ed.), secs. 251, 237, 238, 254, 333c-338, 469d, 219; *Wigmore on Evidence* (2nd Ed.), secs. 2378, 2298, 2332, 2250 *et seq.,* 2266, 826.

The doctrine advocated in this dissent would bring the state and federal rule in harmony and make the rights of the citizen no less secure under the state than the federal constitution. Greater efficiency in administration at the price of unlawful official methods is not paramount to the duty of the judiciary to secure personal liberty under the law to the citizen. *Ex parte Milligan,* 4 Wall. (U. S.) 2; *Byars v. United States,* 273 U. S. 28; *Boyd v. United States,* 116 U. S. 616; *Marron v. United States,* 275 U. S. 192; *Weeks v. United States,* 232 U. S. 383; *Silverthorn Lumber Co. v. United States,* 251 U. S. 385; *Gouled v. United States,* 255 U. S. 298; *Anno v. United States,* 255 U. S. 313; *Carroll v. United States,* 267 U. S. 132, 157; *Gambino v. United States,* 275 U. S. 310; *United States v. Lee,* 274 U. S. 559; *Agnelo v. United States,* 269 U. S. 20, 70 L. ed. 145. See cases collected in 11 *A. L. R.* 681; 13 *A. L. R.* 1, 168; 24 *A. L. R.* 1408; 32 *A. L. R.* 408; 41 *A. L. R.* 31, 45; 52 *A. L. R.* 463-489. *Wigmore* (2nd Ed.), secs. 2183, 2184, gives the best exposition of the rule for admissibility.

A striking illustration of the lengths to which the doctrine

of the admissibility of this evidence carries is found in the appeal of *Richardson v. Maryland*, No. 44, this term, where the evidence obtained was under an illegal warrant against "John Doe, near Porter's Bridge of 6th District, in said Cecil County." "John Doe" was a fictitious name, and so the illegal warrant was not limited to any person or definite place, but was, in effect, a general warrant. *Supra.*

I am authorized to say that BOND, C. J., and DIGGES, J., concur in this opinion.